United States v. Singh Good morning, Your Honours. May it please the Court. I represent Mr. Singh on appeal from his five-year sentence imposed for illegal re-entry. The sentence was almost triple the top of the guideline range of 21 months. I'd like to focus on the procedural defects at sentencing, but before I do that, I'd just like to emphasize how far out of line this is one indicator, but we also have the Sentencing Commission's report from 2015, which demonstrates that in 2013, the year it studied, the median sentence for illegal re-entry offenders with an eight-level enhancement like Mr. Singh's was 13 months. Only 1.2 of such offenders were sentenced above the guideline range. There's nothing about Mr. Singh that is so unusual that puts him in that 1%. In fact, the typical offender had a criminal history category of three higher than Mr. Singh's, and of those with an eight-level enhancement, the average had 5.6 convictions. The median offender had been deported two times like Mr. Singh, and the average offender had been deported 3.2 times. 61.9% had at least one conviction after their first deportation. Mr. Singh was well in the heartland, and an upward variance requires a good reason, and a major variance like this requires a more Judge Forrest's justifications were mostly factually incorrect, legally wrong, or surmise. First, the judge made an apparent factual error about how many times Mr. Singh had re-entered. Wasn't it twice? It was twice, but all of the judge's comments read together indicate that she probably thought that it was more than twice, counting the current one. This was the third time? No, this was the second one. No, no, no. Yeah. Your point is, or you're arguing that she had to have thought that this one was the third time. Right. Two prior re-entries. That's correct. And that mistake was made in the PSR. The PSR falsely stated that this was his third arrest for illegally re-entering the U.S. That was indisputably wrong, and it was pointed out in the briefs, in the sentencing submissions that this was his second, but Judge Forrest seemed to adhere to this error in her . . . Did she adopt the findings of PSR? I believe she did. I believe she did adopt. Without discussion of whether it was two or three prior entries? There was no discussion of that at sentence, exactly. There was no discussion of it. And she said several things . . . When she adopted the findings, did she say with the correction that it was only two times and not . . . Did she correct the error? No. She did not. She did not. It was not discussed at all at sentencing. In fact, she made comments that indicated that she had that error in her mind. She said he would do it again because he's done it two times before. She referred to multiple . . . That was in the course of a forward-looking statement, right, as to what was needed to deter this defendant because he has multiple illegal reentries. That's correct. She referred to multiple reentries, a word that in the dictionary is defined as many manifold several, more than two. She also . . . Multiple means more than two? Well, many . . . People don't usually use the word many to say two or several. I thought she said multiple. Multiple in the Webster's Dictionary is defined as . . . What did the court say? The court said multiple. The court said multiple. The court said multiple reentries. She also said two sentences that are specifically just factually inaccurate that reflect this error. She referred to the multiple times that he has been arrested and spent time in jail and then deported. That only happened once because he was deported the first time after years of litigation, not as a result of being arrested and sitting in jail. He was only deported after being arrested and sitting in jail once. That was in 2012. Next, her mistake was obvious from another factual mistake, which was that she asserted that Mr. Singh had spent the majority of his adult life back and forth between Guyana and the United States. This was clearly wrong. He had first been deported at age 40, and he was 44 when he was arrested on the current offense, so he'd spent exactly four years out of his 24 of his adult life back and forth. This statement would have been closer to correct if he had been deported in 2004, which must have been the basis for the original PSR error because there was an order of deportation in 2004, but he wasn't deported on that until 2010 because it was litigated. It was appealed and litigated. Was the error with respect to the majority of his life being spent going back and forth to Guyana in the PSR? It was not in the PSR. I don't believe that specific statement was in the PSR, but that was a mistake that the judge made on the record. I'd just like to focus on even if the record is not absolutely certain that she was acting on a mistake about his record, if there's confusion or if there's reason to believe that she may have been acting on a mistake about his record, resentencing is required, and that is the Juwa case, which is cited in my brief, where it was even more uncertain than here, and the court vacated the sentence and remanded for resentencing. The second ground that we contest is that Judge Forrest held against Mr. Singh as a refusal to accept responsibility his personal letter to the court in which he both expressed remorse for his actions and offered some explanation and asked for mercy. This is what a defendant is entitled to do. Indeed, it is what he should do. Explaining that he foolishly followed a bad crowd when he was young and explaining that he returned because he had no family in Guyana and had been robbed and beaten there and was frightened did not contradict his statements that he was sorry, that he had done wrong, that he was selfish and stupid, and that he had hurt his family. Holding his own explanation against him and concluding that this warranted a huge increase in his sentence violated Mr. Singh's right to speak on his own behalf at sentencing, to present any information to mitigate sentence, and to plead for mercy. This right has been recognized by this court in Lee, by the Supreme Court in Greene, and it's codified in Federal Rule 32. It wasn't precluded from saying what he said. She just read it a particular way and said, I don't see that as accepting responsibility. In fact, I see it as dodging responsibility. Right. And that's what we contest as wrong. But she did give him the two-point reduction in offense level for that, didn't she? She did. She did. Two or three, sorry, before we... It was three. But she said that she was giving him that because she didn't want to create an issue for appeal, but she was going to consider this in her overall sentence. So we should take her at her word that she did consider it in her overall sentence, which is also subject to review on appeal. And presenting an explanation for one's actions is information and mitigation, not an avoidance of responsibility when the letter is also loaded with apologies and admissions of guilt. Third, Judge Forrest expressed certainty that Mr. Singh would return because of his multiple reentries. Not only was this based on a factual error, he had reentered only once before, exactly average. But this was the first time he was actually charged. He wasn't even charged in his first reentry. This was actually his first offense of illegal reentry. So deterrence for this crime had not even been tried. Judge Forrest had an assumption that somehow he couldn't be deterred because he'd come back again when he had not been charged the first time. And the importance of this conviction is underscored by the new illegal reentry guideline, which adds four levels. Its aim is to punish people who have been convicted of a prior illegal reentry, and it adds four levels only for a prior conviction. There had to have been a conviction for illegal reentry. By the way, Mr. Singh's... Thanks, Ms. Cassidy. Your red light is on, and you've reserved some time for rebuttal. Thank you. Ms. McLeod? May it please the Court, my name is Dina McLeod, and I'm an assistant United States attorney in the Southern District of New York. I represent the government on appeal, and I represented the government in the proceedings below. I'd first like to just clarify one, I think, factual error that appellate counsel referenced, which is that the district court erroneously adopted a recitation in the PSR that the defendant had illegally reentered three times. In fact, that particular reference was in the probation department's recommendation section of the PSR. It was not in the factual part of the PSR. In fact, the factual part of the PSR is accurate. It states that the defendant was deported twice, once in 2010 and once in 2012. Those were the facts that were adopted by the district court, and to which neither the government nor defense counsel had objection. So just to clarify that point, in fact, the PSR and the factual findings adopted by the district court on that point were accurate. And I think the numerous references by the district court are clear that she understood that at the time of sentencing, the defendant had illegally reentered to the country two times at the time of sentencing. And the district court even made reference to what happened in 2010 and 2012, how can we be sure that it won't happen again. The guideline range was 15 to 21 months. Probation department recommended within range. Government was fine with it within range. And we're almost three times above the top. So what is the justification for going so far above the guideline range? There were particular circumstances here that could justify this sort of variance. I think first is the clear and undisputed record that the appellant had strong incentives to return to the United States because his entire family, including a minor child, lived in the United States and they were either lawful permanent residents or citizens of the United States. Is there a proper basis for enhancing a sentence? If someone has family here and therefore there's incentive to return? It is, Your Honor. And I think even defense counsel at the sentencing noted that the presence of family is a double-edged sword because it's both a sympathetic factor for the defendant, but it also demonstrates a need for specific deterrence, which is one of the section 3553a factors that the court had to consider. And the court, looking at the record and the clear ties to the United States, the fact that there was no . . . Does the government have any quarrel with the statistics relied on by defense counsel? No, although I don't . . . again, I think the district court was in . . . I mean, it's so . . . the median sentence is 13 months for someone with this criminal history category and the sentence is 60 months, and I'm just trying to understand why. Right. And I think aside from the clear record as to the strong incentives of this particular defendant to return and the fact that in a relatively short period of time he had been deported twice and returned to the United States, the defendant has a lengthy history of criminal activity, which continued even when the defendant was under orders of removal, and that was something that the district court had strongly in her mind, that even when the defendant returned to the United States, he continued to commit crimes which negatively affected people and businesses in the United States. And so even in, for example, in 2014, he was arrested and eventually convicted of this pettite larceny charge. The concern there was . . . Sorry, of what charge? It was, I believe, a pettite larceny charge. And the concern there was that the defendant is 44 years old. It does not appear that he is aging out, so to speak, of his crimes. There's a concern that he needs . . . None of them were for violence, right, the prior crime? That's right. And I don't think there was any dispute that there was no evidence that the defendant was a violent person, but there was certainly evidence in the record, and I don't think defense counsel disputed that these crimes, theft, larceny, postal theft, use of other people's credit cards do specifically harm individuals. And that was something that clearly was something the district court took into account, that there was direct harm to particular individuals and businesses. And so I think the combination of the strong, strong incentives for the defendant to return, the multiple reentries in a short period . . . Is there an irony in using his ties to the United States to increase his sentence so that he'll stay here longer in jail? There . . . I don't know if there's an irony there. There's certainly . . . he will certainly be in the United States longer. The intention of . . . Give his family more of a chance to visit him in jail and strengthen those ties. The intention of the district court was certainly to impress upon the defendant the need to, upon his removal, and he was not given a term of supervised release to follow, upon his removal to stay in Guyana and essentially understand that he could not return without a period of incarceration. And certainly that was the justification given by the district court. And so with that, those corrections to the PSR . . . What kind of . . . I sort of think of our analysis of the substantive unreasonableness of a sentence along the same lines as shocks, the constant substantive due process violation. What sort of sentence imposed here would, in the government's view, be too much substantively? Certainly a sentence much higher than 60 months. The statutory maximum is 20 years for this particular crime, which I think demonstrates at least what Congress's view is of the seriousness of this crime potentially. This is obviously nowhere near the statutory max in this case. The range was atop of 21 months, right? That's right, Your Honor. But it certainly given the particular circumstances of this case, there were . . . Were his circumstances so different from most defendants who are in these illegal re-entry cases? In some way. Most defendants in these cases are here because they have some family here. Most defendants in these cases have some convictions for relatively minor financial things such as this. How is this so far out of the heartland that it deserves a 60-month sentence? In some ways, this case is like other illegal re-entry cases. In some ways, it's not. It's not necessarily typical that a defendant has his entire family in the United States and that the entire family has legal status in the United States. He should receive a higher sentence because he has more family in the United States? Because he has stronger incentives to the return to the United States because he essentially has no . . . he had no life in Guyana. And again, this is, as defense counsel pointed out, this is a tension with legal re-entry cases. The presence of family in the United States can be both of these things, both a sympathetic factor and both an indicator of the need for specific deterrence. And one other point I would make is that, and this was noted in the PSR and not objected to, the defendant was also under investigation for health care fraud at the time of sentencing. So this was, again, someone who there was just a constant, a stream of continual criminal activity that the district court felt that there was a need for protection of the public from these particular crimes. So unless the court has . . . I see I have a yellow light. Unless the court has any additional questions, the government respectfully submits that this court should affirm the judgment of conviction. Excuse me. Thank you, Ms. McLeod. Ms. Cassidy. Just to address that Medicare fraud allegation that was just brought up, it was not relied on at sentencing, nor could it have been. That's also in Jewa. The court can't rely on crimes that haven't been even charged, never mind not admitted or proven. And just so you know, the Medicare fraud alleged was not making money. It was about the fact that he'd gotten investigated, which was never charged, never charged, was about the fact that he had gotten gastric bypass surgery because he was obese and maybe wasn't entitled to Medicaid for that. It wasn't that he was somehow committing some . . . Uncovered procedure. Well, I don't know what even the basis of the investigation was, but nothing came of it. And I think Judge Chin hit it right on the head that it doesn't really make any sense to punish someone more because they have a lot of family here. The judge was going on his family here and her mistake about his other illegal reentries. And in terms of his record, I'd just like to focus on his record for a minute. He was an absolutely typical offender in every way, including his record. If we look at his record, it shows sporadic involvement with petty theft, mostly misdemeanors with long periods of law abidingness. It wasn't, as Judge Forrest seemed to have in mind, a case of a compulsive criminal who couldn't stop . . . This sentence is clearly harsh. Does it shock our conscience? I mean, should it shock our conscience? It should shock. It should. It should shock our conscience that someone who should have gotten a sentence of 15 to 21 months got a sentence of five years based on incorrect facts. That's in dispute. I mean, the problem I'm wrestling with right now is we say, look, it's not clear to us that you understood the facts, the accurate facts, not the alternative ones, that are at play here for this particular defendant. Please take it back or take it back and reconsider those. And it seems to me once the trial judge, whoever he or she is, takes it back, says, all right, actually, I did have the facts in mind, just as you, Ms. Caskey, are arguing them, and I'm imposing the same sentence. Well, there would be no . . . What you really want us to say is, yes, but that sentence is substantively unreasonable. So how do we say that? What's the measure we put on that, given the deference that we almost invariably show to a trial judge imposing a sentence? Well, the legal standard, and this is in Caveira and Gall and other cases, is that if there is an inadequate justification, if the magnitude of the variance is not supported by a large enough justification, it is substantively unreasonable. It doesn't have to shock the conscience, although I submit that this one does. And here we have no justification. As we've said, he is an absolutely typical Heartland garden variety offender. There is nothing about his circumstances that takes him even out of the guideline range, let alone tripling the guideline range. That is substantive unreasonableness right there. And his record, he had long periods, seven- and eight-year periods with no criminal activity. This man is . . . he's a depressed man. He has crises of depression, and what his record shows is clusters here and there of criminal activity, probably a result of acute depression. The latest offenses, let me just note, were shoplifting, too shoplifting. His more serious . . . the most serious offense he committed was when he was 22, 22 years ago. Since then, the small clusters of activity have been lesser and lesser offenses. So there is just nothing here, nothing that justifies this sentence. A sentence that's unjustified is substantively unreasonable. Thank you very much. Thank you. Thank you both. Excuse me, we'll reserve decision.